**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**STACEY SANDS,**

                **Plaintiff,**　　　　　　**1:12-cv-1094
　　　　　　　　　　　　　　　　　(GLS/RFT)**

                v.

**NEW PALTZ CENTRAL SCHOOL
DISTRICT et al.,**

                **Defendants.**
_____

| | |
|---|---|
| **APPEARANCES:** | **OF COUNSEL:** |
| **FOR THE PLAINTIFF:**<br>Sussman, Watkins Law Firm<br>55 Main Street, Suite 6<br>P.O. Box 1005<br>Goshen, NY 10924 | MICHAEL H. SUSSMAN, ESQ. |
| **FOR THE DEFENDANTS:**<br>Drake, Loeb Law Firm<br>555 Hudson Valley Avenue<br>Suite 100<br>New Windsor, NY 12553 | ADAM L. RODD, ESQ. |

**Gary L. Sharpe
Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

    Plaintiff Stacey Sands commenced this action against defendants

New Paltz Central School District, Maria Rice, and Barbara Clinton,

pursuant to 42 U.S.C. § 1983, alleging that defendants discriminated against her on the basis of race, in violation of the Fourteenth Amendment. (*See generally* Compl., Dkt. No. 1.)  Pending before the court is defendants' motion for summary judgment.  (Dkt. No. 22.)  For the reasons that follow, the motion is granted.

## II. Background[1]

In July 2008, Sands, an African-American female, applied for one of two open positions as a guidance counselor in the New Paltz Central School District.  (Defs.' Statement of Material Facts (SMF) ¶¶ 1-2, 12-13, Dkt. No. 22, Attach. 44.)  As part of the application process, Sands underwent two interviews with members of the school and district administration; both interviews were attended by Clinton, the Principal of New Paltz High School, as well as guidance counselors Kathryn Flanagan and Maryann Antonelle.  (*Id.* ¶¶ 4, 18-19.)  At the close of the interview process, both Clinton and Rice, the superintendent of the district, recommended to the district's board of education that they hire Sands for one of the open guidance counselor positions.  (*Id.* ¶¶ 3, 23; Dkt. No. 22, Attach. 16 at 2.)  Ultimately, on August 20, 2008, Sands was hired, as the

---

[1] Unless otherwise noted, the facts are not in dispute.

board approved a probationary appointment of her to the position of guidance counselor, with her probationary status lasting three years from her date of hire, until August 31, 2011. (Defs.' SMF ¶ 24.)

Over the course of Sands' probationary employment, she periodically received performance evaluations. (*Id.* ¶ 28.) All of Sands' evaluations through January 2011 indicated that her performance was "satisfactory," although they did identify areas in which she needed improvement. (*Id.* ¶¶ 29-30; Dkt. No. 22, Attachs. 17-24.) These evaluations were all composed by either Clinton or Assistant Superintendent Connie Hayes. (Dkt. No. 22, Attachs. 17-24.)

Beginning in the 2010-2011 school year, Sands' third year of probationary employment, Clinton noticed deficiencies in Sands' job performance. (Dkt. No. 22, Attach. 4 ¶ 13.) Clinton issued a performance evaluation in March 2011, which documented her concerns about Sands' performance. (Dkt. No. 22, Attach. 25.) This evaluation was the first to officially denominate Sands' performance as "unsatisfactory." (*Id.* at 3.) Specifically, Clinton noted several areas of deficiency, including: a lack of initiative on Sands' part; "passive rather than pro-active" interactions with students, parents, and administrators; lack of on-going communication with

3

school administration; not giving adequate notice of "[c]hanges in situations" including Sands' failure to follow through on particular initiatives; and insufficient "collaboration with all members of the [guidance] department." (*Id.*) Clinton theorized that the decline in Sands' performance stemmed from the fact that Antonelle, another of the guidance counselors at the high school, had been out of work for a significant period of time that school year, and that as a result, many of Sands' mistakes started becoming more visible. (Dkt. No. 22, Attach. 4 ¶¶ 13-14.) Sands disputes this reason behind her purported deficiencies, instead claiming that her performance was, in fact, adequate, and that there is no basis to attribute any perceived decline in performance to Antonelle's absence. (Dkt. No. 23 ¶ 6.)

At the close of the 2010-2011 school year, Sands' third year of employment and the first juncture at which she would have been eligible for tenure, Clinton recommended to Rice that Sands' probationary period be extended for one additional year. (Dkt. No. 22, Attach. 2 ¶ 21.) As a result, Sands was not given tenure, and, instead, both she and defendants agreed to extend her probationary status for a fourth year. (Defs.' SMF ¶ 55; Dkt. No. 22, Attach. 32.) In connection with this agreement, Sands was placed

4

on a Teacher Improvement Plan, which noted specific areas to be addressed in the coming year and laid out objectives and plans to improve Sands' performance. (Defs.' SMF ¶ 51; Dkt. No. 22, Attach. 33.) Sands was also assigned a mentor, Stephanie Shoemaker, a colleague in the guidance department, to monitor Sands during her fourth year and assist her in improving her performance. (Defs.' SMF ¶ 52; Dkt. No. 22, Attach. 33.)

During the 2011-2012 school year, Sands' fourth year of employment at the district, issues continued to arise regarding her job performance. (Defs.' SMF ¶¶ 56-78.) Although Sands disputes the severity of many of these alleged issues, she admits that during meetings with her mentor, Shoemaker, she was advised of expectations for improving in the area of professional development by, among other things, visiting colleges, and was encouraged by Shoemaker to do so. (*Id.* ¶¶ 61-62.) However, during Sands' fourth year, she only went on a single college visit. (*Id.* ¶ 63.) In addition, Sands understood that one of her responsibilities as a guidance counselor was to organize field trips for students to visit colleges, but over the course of the 2011-2012 school year, she only organized one trip. (*Id.* ¶¶ 68-70; Dkt. No. 22, Attach. 10 at 23-24.)

5

In January 2012, Sands received her second "unsatisfactory" performance evaluation from Jo-Anne Dobbins, the district's Director of Pupil Personnel Services, who had observed and evaluated Sands' performance. (Defs.' SMF ¶ 79; Dkt. No. 22, Attach. 28.) In her review, Dobbins detailed an incident regarding a student who had failed to show up for a required Regents exam, and noted that as an experienced guidance counselor, Sands should have been aware of the rules and procedures regarding such exams. (Dkt. No. 22, Attach. 28 at 3-4.) Dobbins also noted a separate issue with Sands' monitoring of student absences, and indicated "that this needed to be followed more closely from the onset" in order to avoid "a duplication of efforts." (*Id.* at 3.)

In April 2012, Clinton recommended to Rice that Sands not be given tenure at the end of her probationary employment due to her deficient job performance, finding "significant deficits" and thus that Sands did "not meet the district's high quality standards." (Dkt. No. 22, Attach. 30.) Dobbins recommended the same. (Dkt. No. 22, Attach. 31.) In a letter to Sands, Rice indicated that she would not be recommending her for tenure because Sands failed to effectively communicate with others, inadequately addressed academic progress issues of her students, and did not

demonstrate a commitment to contributing as a member of the guidance department.  (Dkt. No. 22, Attach. 35.)  According to Rice, despite being issued a Teacher Improvement Plan noting these deficiencies and being assigned a mentor, Sands did "not show[ ] enough improvement or demonstrate[ ] a consistent quality standard to be recommended for tenure."  (*Id.*)  At the close of the school year, in June 2012, Rice formally recommended to the board of education that they not confer tenure upon Sands, and the board subsequently voted to deny Sands tenure, effectively terminating her employment at the school.  (Defs.' SMF ¶ 92; Dkt. No. 22, Attach. 41.)

Sands commenced this action in July 2012, asserting a cause of action pursuant to 42 U.S.C. § 1983 for race-based discrimination, in violation of the Equal Protection clause of the Fourteenth Amendment.  (Compl.)  Defendants thereafter filed the pending motion for summary judgment.  (Dkt. No. 22.)

### III. <u>Standard of Review</u>

The standard of review pursuant to Fed. R. Civ. P. 56 is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its decision in *Wagner v. Swarts*,

7

827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011), *aff'd sub nom. Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012).

## IV. <u>Discussion</u>

Sands alleges that defendants' denial of tenure to her, and her subsequent termination, were made on the basis of race, in violation of her Fourteenth Amendment equal protection rights. (Compl. ¶¶ 68-69.) In their motion, defendants argue that they are entitled to summary judgment on Sands' claim of race discrimination because the undisputed facts do not raise an inference of unlawful discrimination, the decision to deny Sands tenure was based on a legitimate, non-discriminatory reason—namely, her unsatisfactory job performance—and Sands has failed to produce any evidence that the stated reason for denying her tenure was a pretext for discrimination. (Dkt. No. 22, Attach. 45 at 8-15.) Sands argues that she has established a prima facie case of discrimination, and that there are disputes of fact regarding whether defendants' stated reasons for the denial of tenure were pretextual, rendering summary judgment inappropriate here. (Dkt. No. 27 at 13-20.) The court agrees with defendants, and their motion is therefore granted.

"For a claim of employment discrimination under [section] 1983,

[courts] apply the familiar burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*." *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013). This scheme places upon the plaintiff the initial burden of making out a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). To satisfy this initial burden, the plaintiff "'must show: (1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)). With respect to the last prong of the prima facie case, the Second Circuit has held that "when the person who made the decision to fire was the same person who made the decision to hire," that is a factor that "strongly suggest[s] that invidious discrimination was unlikely." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).

"A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a legitimate, nondiscriminatory reason

9

for the challenged employment action." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks and citations omitted). If the defendant comes forward with a legitimate, nondiscriminatory reason for the challenged employment action, the presumption of discrimination drops out of the analysis, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

Ultimately, once the burden shifts back to the plaintiff, she must show, "without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Holcomb*, 521 F.3d at 138. The plaintiff must demonstrate "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). As further explained by the Supreme Court, to demonstrate pretext, a plaintiff must show "*both* that the [employer's offered] reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see Fisher v. Vassar Coll.*, 70 F.3d 1420, 1433 (2d Cir. 1995). However,

conclusory allegations of discrimination are insufficient to defeat a motion for summary judgment. *See Holcomb*, 521 F.3d at 137; *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

Here, assuming, without deciding, that Sands has established a prima facie case of discrimination, it is clear that defendants had a legitimate, non-discriminatory basis to deny tenure to—and ultimately terminate—Sands, namely, her work performance. *See Davis v. Avaya, Inc.*, 295 F. App'x 380, 381-82 (2d Cir. 2008) (noting that "poor performance" constitutes a legitimate, nondiscriminatory reason for termination). Accordingly, the burden rests with Sands to demonstrate, with record evidence support, that defendants' stated basis for the denial of tenure—Sands' work performance—was a pretext, and that the action taken against Sands was actually motivated by her race. *See Holcomb*, 521 F.3d at 138. While Sands expends a significant portion of her sparsely-cited memorandum of law averring that her job performance did not merit the denial of tenure and her ultimate termination, she has plainly failed to produce any evidence, beyond pure speculation, that would support a finding that these personnel decisions had anything to do with her race. She is therefore unable to prove her equal protection claim, and,

accordingly, defendants are entitled to summary judgment.

While Sands attempts to manufacture a question of fact with respect to some of the deficiencies noted in her "unsatisfactory" performance evaluations, many of the deficiencies are unrefuted by Sands, and, further, any such question of fact is immaterial where, as here, Sands has critically failed to come forth with any evidence that the decision to deny her tenure was based on her race or a discriminatory animus on the part of defendants. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (finding that a plaintiff must rebut evidence of legitimate, nondiscriminatory reasons for dismissal with specific evidence tending to show not only that those reasons were a pretext, but that unlawful discrimination was the real reason for the employment decision); *Grady*, 130 F.3d at 561 ("[T]he creation of a genuine issue of fact with respect to pretext alone is not sufficient. There must also be evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination.").

Sands refers to several incidents which she appears to argue would demonstrate animus towards her race on the part of defendants. By way of example, Sands claims that she "began a Step [Dance] Team," and that

12

"[a]fter one year of providing [Sands] with a stipend for advising this club, . . . Clinton and Rice ended this stipend and proposed that [she] advise the club without charge," but she does not directly posit a reason why this occurred. (Dkt. No. 23 ¶¶ 37, 66.) Although Sands appears to imply that this was done because of her race, or because the "majority [of students] participating on [the team] were African-American," (*id.* ¶ 37), what the record indicates, however, is that Sands was not paid because she failed to submit the required claim form in order to receive payment as an advisor, (Dkt. No. 36 ¶¶ 11-12); Sands cites to no record evidence that would indicate that this decision was racially motivated. In fact, the year prior, when Sands did submit the claim form, she was paid a stipend for her services as advisor to the club. (*Id.* ¶ 10; Dkt. No. 36, Attach. 3).

Similarly, Sands argues that Clinton "initially strongly opposed [her] hiring but was convinced to hire her," and that from this, "[a] reasonable jury could easily conclude that Clinton harbored a bias against [Sands] and that this tainted the entire tenure review process." (Dkt. No. 27 at 14.) However, what Sands neglects to mention in her argument is that the only evidence of record on this issue indicates that Clinton's initial hesitancy in hiring Sands stemmed from a reference she had received from a former

13

employer of Sands regarding a "communication issue" that Sands had with that employer, (Dkt. No. 25 ¶ 5), and there is nothing to indicate that this hesitancy was due to Sands' race.  The only allusion to potential race discrimination in Sands' own affidavit, (Dkt. No. 23 ¶ 72), points to the statement of Edgar Rodriguez, a member of the board of education who, at the time of Sands' tenure decision, "strongly favored grant[ing] tenure and believed that nefarious motivations alone could explain a contrary decision."  (Dkt. No. 27 at 19; Dkt. No. 26, Attach. 1 at 2.)  However, Rodriguez himself stated that he could "*only speculate* nefarious reasons, including racism, for denying . . . Sands tenure."  (Dkt. No. 26, Attach. 1 at 2 (emphasis added).)  It is well settled that "'conclusory allegations or unsubstantiated speculation' [are in]sufficient to raise a triable issue of fact as to whether . . . discriminatory animus" played a role in an adverse employment action.  *DiGirolamo v. MetLife Grp., Inc.*, 494 F. App'x 120, 122 (2d Cir. 2012) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

Further damaging to Sands' argument is her admission that during her years of employment at New Paltz High School, she was never called any racial names or racial epithets by Rice or Clinton.  (Dkt. No. 22, Attach.

14

10 at 16); *see Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000); *Whitting v. Locust Valley Cent. Sch. Dist.*, No. 10-cv-0742, 2012 WL 5289617, at *14 (E.D.N.Y. Oct. 22, 2012) ("[T]he absence of any discriminatory comments . . . weakens the [p]laintiff's claim that [membership in a protected class] was a factor in any of the tenure determinations.").

Sands' assertions that her performance was not as poor as defendants noted in their evaluations, and that she should have been granted tenure because of her documented history of "satisfactory" evaluations, are insufficient to defeat defendants' motion for summary judgment here. *See Avaya*, 295 F. App'x at 382 (finding that employee's "claim that she received stellar employee evaluations in the months and years preceding" her eventual termination "fails to rebut the [employer]'s showing that" her work performance had deteriorated since then). Based on the circumstances of this case, Sands has failed to show that defendants' decisions to deny her tenure and ultimately terminate her had anything to do with her race. *See Schnabel*, 232 F.3d at 91 (finding summary judgment to defendant employer appropriate where plaintiff did not assert that protected status was discussed in decision to take adverse

15

employment action, did not offer any evidence of discriminatory comments or criticisms on the job, and was fired by same parties who made decision to hire); *Grady,* 130 F.3d at 561 (finding "purely speculative" assertions of discriminatory animus insufficient to defeat summary judgment).

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 22) is **GRANTED**; and it is further

**ORDERED** that Sands' complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 3, 2014
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court